# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GARY D. SMITH,                          )
                                        )
                Plaintiff,     )
                                        )
                v.             )        1:09CV587
                                        )
JOHN E. POTTER, Postmaster General )
United States Postal Service,           )
                                        )
                Defendant.     )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

     This matter comes before the Court for a recommendation on "Defendant's Motion For Summary Judgment" (Docket Entry 16) filed by Defendant John E. Potter ("Potter"), the Postmaster General of the United States Postal Service ("USPS"). For the reasons set forth herein, the Court recommends that "Defendant's Motion For Summary Judgment" (Docket Entry 16) should be granted.

## I.  FACTUAL BACKGROUND[1]

     This matter arises out of a pro se Complaint filed by Plaintiff Gary D. Smith ("Smith") on August 5, 2009, which names Potter as the Defendant. (Docket Entry 1.) Smith alleges that he suffered unlawful disability-related employment actions in connection with his employment with the USPS. (See id.) Specifically, Smith claims that his USPS Supervisor James Constable ("Constable") failed to accommodate Smith's disability. (Id.,

---

[1] Consistent with the authority in the Discussion section below, the recited facts reflect the evidence in the light most favorable to the non-movant.

¶ 1.)  Moreover, Smith contends that another USPS Supervisor Ronnie Warren ("Warren") failed to accommodate Smith's disability, and that Warren harassed and threatened Smith.  (Id., ¶ 2.)  Finally, Smith asserts that a third USPS Supervisor, Amanda Dougherty ("Dougherty"), harassed and threatened him.  (Id., ¶ 3.)[2]

## Smith's Initial Injury

Smith began working with the USPS in Gibsonville, North Carolina, in July 1993 (Docket Entry 17-18 (Smith Dep.) at 27:20-25),[3] and he remains currently employed there as a full-time city carrier (id. at 17:20-18:2, 18:23-24).

While playing basketball in early August of 2003, Smith sprained his right foot, and his doctor advised him to stay off it for four to six weeks.  (Id. at 41:23-42:12; Docket Entry 19 at 9.)[4]  On September 4, 2003, Smith was walking a postal route, when he "twisted [his] ankle again very badly[,]" but he told a senior USPS clerk that he would finish his route and his foot "ruptured[.]"  (Docket Entry 17-18 at 42:2-4.)  Smith also injured

---

[2] In Smith's Complaint and deposition transcript, the name of this supervisor appears as "Daugherty."  (See Docket Entry 1, ¶ 3; Docket Entry 17-19 at 61:20-21.)  In Potter's summary judgment brief and Smith's Response, the parties use the spelling "Dougherty" (Docket Entry 17 at 1; Docket Entry 19 at 4.)  This Memorandum Opinion utilizes the latter spelling.

[3] Smith's deposition was filed in the Court's electronic filing system in three parts, and, therefore, was assigned three separate CM/ECF numbers (Docket Entries 17-18, 17-19, 17-20).  The Court refers to the deposition by the CM/ECF docket number attributed to the respective portion of the deposition, and uses the page and line numbers assigned to the deposition by the transcript preparer.

[4] The exhibits attached to Smith's Response do not have page numbers or exhibit identifiers (see Docket Entry 19 at 8-10); therefore, the Court refers to these documents by the CM/ECF page number.

his back (id. at 42:18-19), although the record does not show exactly when that injury occurred.[5]

Smith's doctor restricted his work duties and, in or around September 2003, Smith's supervisor, Teresa Long, placed Smith "on light duty for maybe a week or two maybe, and then after that . . . put [Smith] on extended sick leave for three months." (Id. at 45:1-3, 45:9-15.)[6] A Duty Status Report (also identified as "Form CA-17"), dated December 3, 2003, signed by Smith's physician, stated that he could return to work with a fifteen-pound lifting restriction (Docket Entry 17-22 at 2),[7] and in January 2004, Smith was working in a limited duty status (Docket Entry 17-21 (Constable Aff.), ¶ 4). A subsequent January 7, 2004, Duty Status Report prohibited Smith from lifting more than fifteen pounds or "Bending/Stooping." (Docket Entry 17-23 at 2.) On January 8, 2004, Long signed an "Offer of Modified Assignment (Limited Duty)" with Smith that provided for a six-hour work-day and office duties

---

[5] Some forms related to Smith's work restrictions describe his back injury as resulting from "Stepp[ing] out of truck/twisted back." (See Docket Entries 17-22, 17-25, 17-26, 17-28, 17-30.) The cause of Smith's injury does not affect the disposition of this matter.

[6] Smith asserts that Long "disregarded the doctor's notice" by placing him on sick leave (Docket Entry 17-18 at 45:1), but he has not alleged any illegal conduct regarding her actions (see Docket Entry 1). Smith stated that any allegations regarding Long were in his proposed amended Complaint (Docket Entry 17-19 at 54:6-19); Smith's motion to file that amended Complaint was denied as futile (Docket Entry 13).

[7] Potter's brief includes exhibits which have their own separate attachments. For purposes of clarity, this Memorandum Opinion refers to the exhibits to that brief by the CM/ECF docket numbers.

that he could perform while sitting.  (Docket Entry 17-21, ¶ 6; Docket Entry 17-24 at 2.)

On January 14, 2004, Constable was assigned to the Gibsonville Post Office as the Officer-In-Charge ("OIC") (Acting Postmaster). (Docket Entry 17-21, ¶ 3.)  He instructed Smith to meet with his physician and to provide updated medical information.  (Id., ¶ 7.) Smith submitted a January 27, 2004 Duty Status Report that stated that he could return to work with a twenty-five-pound lifting restriction.  (Docket Entry 17-25 at 2.)  Subsequently, a Duty Status Report from February 4, 2004, was provided to Constable which continued the twenty-five-pound lifting restriction and added a walking restriction to one hour per day in fifteen minute increments.  (Docket Entry 17-26 at 2-3.)

On February 12, 2004, Constable signed and Smith initialed an "Offer of Modified Assignment (Limited Duty)" creating a position for Smith which, according to Constable, permitted Smith to "perform various office duties while on modified duty assignment." (Docket Entry 17-21, ¶ 10; Docket Entry 17-27.)  That agreement provided that Smith's duties included: case mail; pull down mail; deliver mail by walking and riding; observe all safety requirements; other duties as assigned by Postmaster or designee. (Docket Entry 17-27.)  The requirements for these duties were described as "stand while casing mail" for up to three hours; "walk in 15 minute increments up to 1 hour per day[;]" lift < 20 lbs, load trays to < 25 lbs, hand off parcels > 25[;]" and "drive postal

-4-

vehicle." (Id.) Smith later provided a Duty Status Report dated February 16, 2004, which stated that he could return to work with a fifteen-pound lifting restriction. (Docket Entry 17-28 at 2.)

On March 10, 2004, Smith met with Dr. E.L. Hines with respect to "persistent spasm in his back." (Docket Entry 17-29 at 2.) Dr. Hines wrote: "Have told Gary that I cannot find any medical basis for further restricting him at work in any way and that he should return to all his regular duties at work. I have no other suggestions for management." (Id.)[8]

In early April 2004, Smith submitted a Duty Status Report dated March 31, 2004, which provided for a restriction of working "6 hours a day" and "lifting limit 15-20 pounds." (Docket Entry 17-21, ¶ 3; Docket Entry 17-30 at 2.) Constable received the form, but failed to take note of the restriction:

> Mr. Smith asked me to make a copy of the CA-17 for him, so without looking at the form, I copied it and filed it. Unfortunately, when I stuck it in the file cabinet, I missed Mr. Smith's folder and placed it between his folder and the next folder. Because of my oversight, I continued to occasionally schedule assignments for Mr. Smith that exceeded his six-hour restriction. Two weeks passed before Mr. Smith indicated to me that I was violating his restrictions. I did not think I was violating his restrictions and asked him what restriction I had violated.

---

[8] Around February or March of 2004, Constable recommended Smith for the Associate Supervisory Program, a promotion, but Smith had a prior disciplinary action warning in his record which prevented him from going into the program. (Docket Entry 17-19 at 74:12-76:22.) Smith did identify a hypothetical downside of the program could be a placement in the "Bulk Mail Center," the administrative office or being sent to Raleigh or Winston-Salem. (Id. at 76:22-77:4.)

(Docket Entry 17-21, ¶ 13.)  According to Smith, "[w]hen Mr. Constable asked how he was violating my restriction, I told him to look at the CA-17 form."  (Docket Entry 19 at 2.)[9]

On April 13, 2004, Smith wrote a letter to Shared Services Center, the agency which processes injury compensation claims for the USPS, and complained in relevant part that:

> I am writing this letter to inform your office of Mr. James Constable [sic] constant violations on [sic] the doctor's request.  Mr. Constable has been less cooperative to the form or my recovery from the injury. Not only has the Officer in Charge has [sic] violated my Ca-17 [sic], which was listed on March 18, 2004, but he has made it clear of my expectation within the office. Mr. James is working me over 6 hours a day, but also noted by given [sic] me a form 1017-B for Unauthorized Over time. . . . Mr. James is continuing to violate my Limited Duty status and mention [sic] to one of my customer [sic] of his action in Removing me.

(Docket Entry 17-12, ¶ 14; Docket Entry 17-31 at 2.)[10]  On April 29, 2004, Smith wrote a letter to the Post Office Operations Manager, Maged Aziz, stating in pertinent part that:

---

[9] Constable contends that Smith refused to answer:

Mr. Smith would only say "You know."  On April 12, 2004, I asked Mr. Smith to tell me specifically what restriction I was violating.  He refused to answer.  Even when the Union Steward asked Mr. Smith to answer, he sat silently, refusing to answer.

(Docket Entry 17-21, ¶ 13.)

[10] Smith complained that Constable followed Smith, as supervisors may do for an evaluation, and questioned Smith's delivery customers saying to one that Smith was "not a good carrier and they're going to get rid of [Smith,]" but Smith alleges that Constable did not follow other carriers.  (Docket Entry 19 at 5, 8-9; Docket Entry 17-20 at 93:22-94:1.)  Smith states that he has "witness statements about some of the negative comments that were made about me." (Docket Entry 19 at 5.)  It appears that this comment is the one that Smith is referring to, because no other comment is identified.  (Id.)

I am writing this letter to inform your office of Mr. James Constable [sic] constant violations of my restrictions. I have notified Shared Services of his violations and also brought these incident [sic] to my local steward. Mr. Constable is aware of my limitations and restrictions but chooses to ignore my CA-17. My doctor has brought these restrictions to my current supervisor [sic] attention. . . . Although Mr. Constable has instructed me to violate my doctor's restrictions, he also instructed me of his disciplinary actions concerning Unauthorized Overtime. (PS Form 1017-B) I do have some good days on my job, but the medications along with my injuries prohibit me to perform within the Full Duty Assignment.

(Docket Entry 17-12, ¶ 15; Docket Entry 17-32 at 2.)

Smith filed an EEO claim which resulted in a May 4, 2004, mediation. (Docket Entry 17-12, ¶ 16.) At this mediation, Smith produced the March 31, 2004, Duty Status Report. (<u>Id.</u>) Constable admitted his "oversight regarding Mr. Smith's work restrictions . . . ." (<u>Id.</u>)

Smith had previously been scheduled to work on a particular route on May 6, 2004. (<u>Id.</u>, ¶ 17.) Smith's schedule was not altered, despite the mediation meeting, because, as Constable explained:

I had previously settled grievances with the National Association of Letter Carriers (of which Mr. Smith is a member) that required that I not work a non-overtime desired employee on his day off, that I not borrow qualified carriers from other offices, and that I not use rural carrier associate to do city carrier work. I had only two employees eligible to work that day - Gary Smith and Tim Neese. I had a responsibility to accomplish delivery of the mail using those resources available to me.

(<u>Id.</u>) After Smith was already out at work, Constable's manager e-mailed instructions to Constable to begin scheduling Smith to work six hours per day. (<u>Id.</u>) Smith complains that Constable did not

"go out on the route and find me to make sure that I did not work more than six hours on that day." (Docket Entry 19 at 2.)

According to Constable, from May 7, 2004, until Constable left his position on June 24, 2004, Smith did not work more than six hours on any particular day. (Docket Entry 17-12, ¶ 17.)[11] During this period, Constable "held official discussions and pre-disciplinary interviews with Mr. Smith and his Shop Steward regarding Mr. Smith's poor performance," but Constable only issued a disciplinary action against Smith "when he failed to properly scan an overnight Express Mail piece in late May[.]" (Id., ¶ 19.)

On May 20, 2004, Smith filed an EEO Complaint related to Constable's conduct. (Docket Entry 17-1, ¶ 5; Docket Entry 17-2 at 2.) On June 14, 2004, Smith contacted an EEO counselor complaining of discrimination by Constable and that dispute resulted in a settlement between the parties. (Docket Entry 17-1, ¶ 6; Docket Entry 17-7 at 2-3.)

### Supervisor Warren

In June of 2004, after Constable left, Warren began to supervise Smith. (Docket Entry 1, ¶ 2; Docket Entry 17 at 5; Docket Entry 17-21, ¶ 17.)[12] Warren remained Smith's supervisor

---

[11] Smith speculates that "[p]ayroll records may indicate that I worked more than six hours a day during the weeks and months after May 6." (Docket Entry 19 at 3 (emphasis added).)

[12] Smith's Complaint asserts that Constable violated his work restrictions "from January 2004 to July 2004" and that Ronnie Warren replaced Constable in August 2004. (Docket Entry 1, ¶¶ 1-2.) In his deposition, Smith testified that Warren was his supervisor from "[p]robably July of 2004 through probably August 2005, I believe." (Docket Entry 17-20 at 85:10-11.)

until August of 2005.  (Docket Entry 17-20 at 85:8-11.)  According
to Smith, on September 15, 2005, Warren requested that Smith make
an appointment with his doctor for an update on his condition.
(Docket Entry 1, ¶ 2.)  Smith asserts that his doctor placed a
restriction on walking only thirty minutes, but Warren violated
this restriction by placing him on a forty-five-minute walking
route.  (Id.)  In Smith's view, Warren gave other carriers
scheduling flexibility for sports and re-allocated "all their
workload on [Smith]" despite Smith's restricted duty.  (Docket
Entry 17-19 at 63:11-17.)  Warren allegedly told Smith, "'Your
doctor don't run my office.  I run my office.  Your doctor don't
tell me what to do.  If you don't do it, you know you're going to
get fired, . . . I'm going to terminate you.'" (Id. at 63:17-20.)

Smith's Complaint alleges that Warren "harass[ed] and
threaten[ed] [him] with removal from postal employment if [Smith]
did not comply with [Warren's] directives."  (Docket Entry 1, ¶ 2.)
In his deposition, Smith explained that Warren harassed Smith by
telling him to go home after he clocked out, and that he was not to
be "in stores or restaurant [sic] with [his] uniform on . . . ."
(Docket Entry 17-20 at 84:15-18.)[13]

According to Smith, Warren discriminated against Smith by
using derogatory terms, referring to Smith "as a boy on several
occasions, and he used some other derogatory names . . . ."

---

[13] Smith asserted that Warren would permit another carrier to change in a
work bathroom after that carrier's shift ended so that he could go to another
job.  (Docket Entry 17-20 at 85:12-14.)

(Docket Entry 17-20 at 86:2-7.)  Smith told Warren "'that comment, 'boy,' is somewhat derogatory. . . . I'd appreciate if you don't call me that.' [Warren] said, 'I don't care what you want.'" (Id. at 86:7-11.)

The Complaint alleges that, after Smith filed one such EEO Complaint, Warren "retaliated by writing a proposal for removal from employment" (Docket Entry 1, ¶ 2), and, in his deposition, Smith claimed that Warren "had an agenda" to "remove" Smith. (Docket Entry 17-20 at 86:15-17.)  For example, on one occasion, instead of leaving a notice at a business about the delivery of a parcel, Smith went back to the business before the end of the workday. (Id. at 86:18-25.)  Warren told Smith, "'Next time you go outside your regular route . . . I will ask for your removal.'" (Id. at 87:6-7.)  Smith explained that he was delivering a parcel and Warren responded, "'I don't care what you was doing.'" (Id. at 87:10-11.)[14]  According to Smith, on another occasion, Warren asked for Smith's removal for delaying the delivery of some circulars. (Id. at 87:21-88:3.)  Smith explained that the delivery was another carrier's responsibility, and then he stated to Warren: '"Aren't you going to call her in for delaying mail . . . .'" (Id. at 88:4-11.)  Warren responded: "'You don't tell me what to do.  You get on out of my office.'"  (Id. at 88:12-13.)

Smith filed six EEO Complaints regarding different instances of Warren's conduct.  (Docket Entry 17-1, ¶¶ 7-12; Docket Entries

_____

[14] Another carrier reported that Smith was at the business eating.  (Docket Entry 17-20 at 86:25-87:5.)

17-8, 17-9, 17-10, 17-11, 17-12, 17-13, 17-14, 17-15.)  The final decision regarding those six actions was taken more than 90 days prior to Smith's filing of this lawsuit.  (<u>See</u> <u>id.</u>)  He twice contacted an EEO counselor complaining of discrimination regarding Warren; both those incidents were settled.  (Docket Entry 17-1, ¶¶ 13-14, Docket Entries 17-16, 17-17.)

## Supervisor Dougherty

In October of 2004, Dougherty was Smith's supervisor for four days as Acting OIC in Gibsonville.  (Docket Entry 17-19 at 61:22-24, 64:20-22; Docket Entry 17-33 (Yourse Aff.), ¶ 7.)[15]  According to Smith, Dougherty treated him "indifferent[;]" yelled at him, "'Get back in your cage[;]'" and talked to Smith "as if [he] was a child."  (<u>Id.</u> at 61:25-62:7.)

Smith's Complaint also contends that, in October 2004, he returned to the office after a physical therapy session for his back and Dougherty was "harassing [him] about being more productive."  (Docket Entry 1, ¶ 3.)  Smith told Dougherty that he had contacted the EEO regarding her treatment of him.  (<u>Id.</u> at 56:5-8, 62:8-9.)  When he contacted the EEO, Smith requested that "she take some type of class dealing with diversity because for some reason - I don't know, black males, or whatever - she had a problem with me."  (<u>Id.</u> at 56:12-14.)  According to Smith, Dougherty said: "'Well, I can say you harassed me[,]'" and "'I

_____

[15] Dougherty's last name is now Lucas.  (Docket Entry 17-19 at 61:20-21.) She was in Gibsonville as part of an Associated Supervisory Program.  (<u>Id.</u> at 61:22-25.)

could say that you threatened me[.]'" (Id. at 56:9-11, 62:10-11.) Smith's Complaint alleges that Dougherty did retaliate against him by filing a complaint that he had threatened her which resulted in a 32-day Emergency Placement removal from work, and a grievance filed with the National Association of Letter Carriers. (Docket Entry 1, ¶ 3.)

According to Livia Yourse, a Labor Relations Specialist for the USPS, on October 29, 2004, Smith called Dougherty to report that he was unable to lock some cluster boxes, and Dougherty went out to meet Smith to investigate the problem. (Docket Entry 17-33, ¶¶ 1, 7.) Yourse explained Dougherty's version of the incident and the USPS's subsequent response:

> When Ms. Dougherty asked Mr. Smith how much time he had left on his route, he did not respond in an acceptable manner and clinched his fist by his side, took a few steps toward her, and got in her face very close in a challenging manner such that she felt threatened and intimidated by his actions and believed that her person was in danger. Ms. Dougherty twice told Mr. Smith to step back. Mr. Smith told Ms. Dougherty that she needed to step back and finally went back to his vehicle and continued on his route. Ms. Dougherty reported the incident to Maged Aziz, Post Office Operations Manger ("POOM") who contacted Mark Matics, Human Resources Manager who in turn contacted Gary Chriscoe, Manager, Labor Relations. All involved members of management decided that Mr. Smith's conduct constituted violence in the workplace and the Threat Assessment Team was convened by conference call. Ms. Dougherty was instructed to call the Inspection Service and to place Mr. Smith on Emergency Placement Off-Duty Status. Maged Aziz instructed Kurt Barlow, Postmaster Mebane, to go to the Gibsonville Post Office immediately to be there with Ms. Dougherty when Mr. Smith arrived back at the

> Gibsonville Post Office.  Upon Mr. Smith's arrival at the
> Gibsonville Post Office, Ms. Dougherty issued Mr. Smith
> the Emergency Placement Letter witnessed by Kurt Barlow.

(Docket Entry 17-33, ¶ 7; Docket Entry 17-34 at 2; Docket Entry 17-35.)  Smith filed a grievance regarding his Emergency Placement in Off-Duty Status.  (Docket Entry 17-33, ¶ 6; Docket Entry 17-35.) On June 12, 2005, the arbitrator found that the USPS "has not established that Gary Smith committed 'threatening misconduct toward [Dougherty]'" and "sustained the grievance" which required the USPS to remit back pay.  (Docket Entry 17-33, ¶ 6; Docket Entry 17-35 at 20-21.)[16]

### EEO Complaint (Case No. 4C-270-0097-04) Procedural Background

Cynthia N. Gorham, an EEO/ADR Analyst for the USPS (Docket Entry 17-1 (Gorham Aff.), ¶¶ 1 & 5),[17] stated that: "In May 2004, Gary Smith contacted an EEO counselor alleging that he had been discriminated against based on Race (African American), Color (Black), Sex, Age, and Disability when James Constable displayed the acts of being critical and discriminatory toward Mr. Smith at the Gibsonville Post Office."  (Id., ¶ 5.a.)

On May 20, 2004, Smith filed an "EEO Complaint of Discrimination in the Postal Service" which was assigned the Case No. 4C-270-0097-04.  (Docket Entry 17-1, ¶ 5.b.; Docket Entry 17-2, at 2.)  As to the "Name and Title of Person(s) Who Took the

---

[16] Smith's union and the USPS, by agreement, settled the back pay issue for a payment of $1,681.31.  (Docket Entry 17-33, ¶ 9; Docket Entry 17-38 at 2-3.)

[17] Gorham does not explain what the term "EEO/ADR" means, but it would appear to mean Equal Employment Opportunity/Alternative Dispute Resolution.

Action(s) You Allege was Discriminatory[,]" Smith wrote "Mr. James
Constable (Officer In Charge)." (Docket Entry 17-2 at 2.) As to
the "Type of Discrimination You Are Alleging," Smith checked the
box "Race" and wrote next to it "African American"; he also checked
the box "Color" and wrote "Black" next to that box; he also checked
the boxes for "Sex," "Age (40+)," and "Disability." (Id.) In a
box on the form that asks for the "Date on which alleged act(s) of
Discrimination Took Place," Smith wrote: "You have on file most
recent (Time Change)." (Id.)[18] According to the information on the
form:

> Mr. Constable has displayed acts of being critical +
> discriminative toward me at the Gibsonville Post Office.
> His perception of me was noted on yesterday 5/19/04, when
> he stated, "Don't steal my good pen." James also mention
> [sic] that Jimmy Barnette[19] borrows pen without
> returning, but used the word steal in my behalf. Mr.
> Constable has finally discovered that he was violating my
> restricted duty for almost 2 months. Mr. Constable
> contacted Mr. Majed of his discovery of my restricted
> duties after working me over 10 hrs. on 5/6/04.

(Id.)

On December 27, 2005, an Equal Employment Opportunity
Commission ("EEOC") Administrative Judge issued a decision
addressing whether Smith "was discriminated against based on his
race (African American), color (Black), sex (male), age (41 - DOB
[redacted]) and physical disability (on-the-job-injury), when on

---

[18] In that box, some of Smith's response appears to have been cut off in
reproducing the document, "5/[illegible] All c[illegible] came n[illegible] early
[illegible]." (Docket Entry 17-2, at 2.)

[19] In his deposition, Smith identified a "Jimmy Barnett" as a full-time
"sickly" caucasian postal carrier who has since left the USPS. (Docket Entry 17-
19 at 47:1-21.)

May 6, 2004 his restrictions were violated after he worked over 10 hours[.]" (Docket Entry 17-3 at 3.) The Administrative Judge found that Smith "failed to present sufficient evidence demonstrating that he was discriminated against as alleged." (Id. at 15.)

On January 26, 2006, the USPS issued a Notice of Final Action to "implement the decision of the Administrative Judge." (Docket Entry 17-4 at 2.) Smith appealed that action and, on March 19, 2009, the EEOC, through its Office of Federal Operations ("OFO"), in a decision with the identifier "Appeal No. 0120062295," "affirm[ed] the final agency order because the Administrative Judge's ultimate finding, that unlawful employment discrimination was not proven by a preponderance of the evidence, is supported by the record." (Docket Entry 17-5 at 2-3.) Smith requested reconsideration of the EEOC's decision and, on May 28, 2009, the EEOC, through the OFO, in a "Denial Of Request For Reconsideration," stated: "The decision in EEOC Appeal No. 0120062295 remains the Commission's decision." (Docket Entry 17-6.)

Smith's Complaint

On August 5, 2009, Smith filed a three-paragraph Complaint in this Court. (See Docket Entry 1.) Each paragraph sets forth his claims as they relate to each specific supervisor (i.e., Constable, Warren and Dougherty). (See id.)

The first paragraph alleges that Constable failed to accommodate Smith's work restrictions:

> James Constable <u>violated my work restrictions</u> from January 2004 to July 2004. I was on limited restricted duties because of a job-related <u>back injury</u>. Although, my supervisor, Mr. Constable, received a notice from the doctor regarding my <u>weight lifting</u> restrictions and the <u>maximum number of hours I was able to work</u>, I was still required to <u>lift heavier packages and work longer hours</u> than the doctor stated. I was told I could receive disciplinary actions if I did not comply with his instructions. I did have a hearing with the EEOC about his actions.

(<u>Id.</u>, ¶ 1 (emphasis added).)

The second paragraph states allegations regarding Warren's failure to accommodate Smith's work restrictions, harassment, and retaliation:

> On September 15, 2004, Mr. Warren requested that I visit my physician for an update on my condition. Due to the repeated violations of my limited restrictions, the doctor added a <u>walking restriction</u>. Thirty minutes was the maximum amount of time I was allowed to work on a forty-five minute walking route. The weight of the mailbag combined with the <u>walking</u> was aggravating <u>my back and foot injuries</u>. <u>Mr. Warren did not comply with these restrictions. He continued to harass and threaten me with removal from postal employment if I did not comply with his directives. When I filed a complain [sic] with the EEOC, Mr. Warren retaliated by writing a proposal for removal from employment.</u> In January 2006, my doctor determined that the repeated violation of these restrictions resulted in a permanent injury to my back. In April, 2006, after being examined by a physician from the Department of Labor, they also determined that the injury to my back was now a permanent disability.

(<u>Id.</u>, ¶ 2 (emphasis added).)

The third paragraph alleges that Dougherty harassed and threatened Smith:

> In October 2004, Amanda Daugherty also violated my rights. <u>Upon my return to the office from a physical</u>

therapy session for my back, she began harassing me about
being more productive.  When I told her that I would
contact the EEOC if she kept harassing me, she retaliated
by filing a complaint that I threatened her.  This
resulted in an Emergency Placement from work for 32 days.
A grievance was filed with the National Association of
Letter Carriers (NALC).  During an arbitration of the
incident it was determined that I did not threaten her
and that she acted as a tyrant instead of a supervisor.
I was supposed to receive back pay for the hours of
employment that I missed, however I did not receive full
payment nor did I receive the annual leave and sick days
that would have accrued from the hours worked.

(Id., ¶ 3 (emphasis added).)

April 14, 2010 Opinion and Order

Smith made a Motion to Request to Amend Complaint and Add
Additional Parties (Docket Entry 11), which the undersigned United
States Magistrate Judge denied as futile (Docket Entry 13).  As
that decision noted, "neither Plaintiff's Complaint nor his
proposed amended complaint identif[ied] the legal basis for his
claim(s)."  (Docket Entry 13 at 5.)  However, "Defendant Potter
correctly singled out the Rehabilitation Act as the logical
statutory predicate for Plaintiff's workplace, disability-related
claim(s) . . . ."  (Id. at 6.)  Indeed: "The Rehabilitation Act
provides the only potentially viable basis for Plaintiff's
allegations that he suffered disability mistreatment as a USPS
employee."  (Id. at 13-14.)

## II. DISCUSSION

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.

-17-

P. 56(a).  A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A fact is material only if it might affect the outcome of the case under the governing law.  Id. at 248.  The Court must view the evidence and any reasonable inferences drawn from the evidence in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

The moving party may discharge its burden by identifying an absence of evidence to support the nonmoving party's case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Accord Simmons-Blount v. Guilford County Bd. of Educ., No. 1:06CV944, 2010 U.S. Dist. LEXIS 34485, at *8-9 (M.D.N.C. Apr. 7, 2010) (unpublished) (Beaty, C.J.).  The non-moving party must then "set forth specific facts showing that there is a *genuine issue for trial*."  Matsushita Elec. Indus. Co., 475 U.S. at 586-87 (citation omitted) (emphasis in original).  The nonmoving party must convince the Court that evidence exists upon which a finder of fact could properly return a verdict in favor of the nonmoving party. Anderson, 477 U.S. at 252 (citation omitted).  Accord Simmons-Blount, 2010 U.S. Dist. LEXIS 34485, at *8-9.  See also Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

B.  Analysis

Potter argues that Smith's claims related to Warren and Dougherty should be dismissed, because Smith has failed to exhaust his administrative remedies with respect to their conduct. (Docket Entry 17 at 7-13.)  Alternatively, Potter first contends that Smith's claims of retaliation related to Warren and Dougherty fail, because Smith cannot show that the reasons offered by the USPS "for its actions are a sham to cover up unlawful discrimination." (Id. at 18.)  Potter's second alternative argument asserts that Smith has no viable harassment claim, because "[t]he conduct alleged fails to reach a level of severity or perversity [sic] required to create a hostile work environment." (Id. at 19.)  Potter seeks summary judgment on Smith's Rehabilitation Act claims on the ground that Smith has not shown that he falls within the class of individuals that the Rehabilitation Act protects. (Id. at 13-18.)

Because Potter's exhaustion of administrative remedies argument has merit, the Court need not reach the alternative arguments as to his discrimination and retaliation claims regarding Warren and Dougherty.  As to Smith's Rehabilitation Act claims, the Court should grant summary judgment because Smith has not presented sufficient evidence for a reasonable fact-finder to conclude that he suffered from a disability.

### 1.  Exhaustion of Administrative Remedies

Potter argues that: "Because Plaintiff failed to exhaust his administrative remedies with respect to his claims against Warren and Dougherty, those claims should be dismissed." (Docket Entry 17

at 9.)  Smith responds: "I have tried to use the administrative remedies available to me beginning with the NALC and the EEOC." (Docket Entry 19 at 5.)[20]

A plaintiff generally can proceed under Title VII only on matters as to which he exhausted administrative remedies.  See Jones v. Calvert Group, Ltd., 551 F.3d 297, 300 (4th Cir. 2009) ("Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit. . . . [A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim." (internal quotation marks omitted)).

---

[20] According to Potter, Smith's statement does not respond to Potter's argument and, "[a]ccordingly, Defendant's argument should be deemed uncontested and summary judgment in favor of Defendant should be granted on these claims." (Docket Entry 20 at 6-7 (citing M.D.N.C. R. 56.1(d).)  Smith has not presented any rebuttal to Potter's exhaustion of administrative remedies argument and the Court thus may grant summary judgment on the ground that he has abandoned his claim as it relates to Warren and Dougherty's conduct.  See Rogers v. Unitrim Auto and Home Ins. Co., 388 F. Supp. 2d 638, 641 (W.D.N.C. 2005) (ruling that plaintiffs who made no argument regarding particular claim in response to summary judgment motion were "effectively abandoning" said claim); Wainright v. Carolina Motor Club, Inc., No. 1:03CV01185, 2005 WL 1168463, at *13 (M.D.N.C. Apr. 27, 2005) (unpublished) (Sharp, M.J.) ("At the outset, the Court notes that Plaintiff failed to make any argument in her brief regarding her failure to promote claim. In the face of [Defendant's] arguments and supporting evidence in its brief in support of summary judgment, Plaintiff's failure to argue this claim is tantamount to abandonment of the claim. See Local Rule 7.3(k)."); Brand v. North Carolina Dep't of Crime Control and Pub. Safety, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004) (Bullock, J.) ("In Plaintiff's brief in response to Defendants' motion for summary judgment, Plaintiff does not address . . . his hostile work environment claim.  By failing to respond, Plaintiff concedes that he has not stated a hostile work environment claim.").

A federal employee who seeks to bring a Title VII claim against an employing agency must file an administrative complaint with the agency that allegedly discriminated against him. 29 C.F.R. § 1614.106(a); see Laber v. Harvey, 438 F.3d 404, 416-17 (4th Cir. 2006) (describing a federal employee's administrative remedies process). The agency must conduct an investigation of the complaint, see 29 C.F.R. § 1614.108-109, and must issue a final decision concluding whether it found discrimination, see 29 C.F.R. § 1614.110. See Laber, 438 F.3d at 416. The federal employee "may then appeal the agency's decision to the OFO[,]" id. at 416 (citing 29 C.F.R. § 1614.401(a)),[21] or he "may also opt-out of the administrative process at this point by filing a de novo civil action[,]" id. at 416 n.9 (citing 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407). If the employee appeals to the OFO, the employee may file a civil action in district court 180 days after filing that appeal or within 90 days after the OFO's final decision on appeal. 29 C.F.R. § 1614.407(c) & (d). If an appeal has not been filed, the employee may file a civil action in district court within 90 days of the receipt of a final action by an agency, or

_____

[21] The OFO acts on behalf of the EEOC to conduct an appellate review of an employee's complaint. 29 C.F.R. § 1614.404(a).

after 180 days from the filing of a complaint with an agency. 29 C.F.R. § 1614.407(a) & (b); 42 U.S.C. § 2000e-16(c).[22]

Only Smith's EEO Complaint regarding Case No. 4C-270-0097-04 may be a basis for this action. (See Docket Entry 17-1, ¶ 5,Docket Entries 17-1, 17-2, 17-3, 17-4, 17-5, 17-6 .) Although Smith filed ten EEO complaints between 2004 and 2009 (see Docket Entry 17-1, ¶¶ 4-14; Docket Entries 17-1, 17-2, 17-3, 17-4, 17-5, 17-6, 17-7, 17-8, 17-9, 17-10, 17-11, 17-12, 17-13, 17-14, 17-15, 17-16, 17-17), the final actions taken in those other matters occurred more than ninety days prior to Smith's filing of the instant action (see Docket Entry 1).

As the United States Court of Appeals for the Fourth Circuit recently reiterated: "'Only those discrimination claims stated in the initial charge, those reasonably related to the original

---

[22] That provision states in its entirety:

Within 90 days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) of this section, or by the Equal Employment Opportunity Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Equal Employment Opportunity Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e-5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

42 U.S.C. § 2000e-16(c).

complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" <u>Jones</u>, 551 F.3d at 300 (quoting <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 963 (4th Cir. 1996)). Smith's claims, as they relate to Warren's violation of Smith's work restrictions and to Warren and Dougherty's harassment: (1) were not "stated in [his] initial charge" (<u>id.</u>); (2) are not "reasonably related to [his] original complaint" (<u>id.</u>); and (3) are not "developed by reasonable investigation of [his] original complaint" (<u>id.</u>). <u>See, e.g.</u>, <u>Chacko v. Patuxent Inst.</u>, 429 F.3d 505, 506 (4th Cir. 2005) ("A plaintiff fails to exhaust his administrative remedies where, as here, his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit.").

Smith's Complaint alleges that Warren and Dougherty's conduct constituted unlawful retaliation in response to his filing of EEO Complaints. (Docket Entry 1, ¶¶ 2-3.) Potter argues that Smith's "claim of retaliation . . . does not reasonably relate to nor grow out of any of Plaintiff's prior EEOC charges." (Docket Entry 17 at 11-12.) "[T]he scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the [EEOC]." <u>Jones</u>, 551 F.3d at 302 (quoting <u>Nealon v. Stone</u>, 958 F.2d 584, 590 (4th Cir. 1992)) (internal quotation marks omitted). The "critical question" as to whether a claim relates to the allegation in the charge is whether that claim

"relates back to the charge that is properly" before the court. Id. at 304. However, where "the alleged retaliation could have been raised in the original EEOC complaint[,]" plaintiffs "must exhaust their administrative remedies[.]" Riley v. Tech. & Mgmt. Servs. Corp., 872 F. Supp. 1454, 1460 (D. Md. 1995).

Smith's claims of discrimination and retaliation by Warren and Dougherty do not "relate[] back to the charge that is properly" before the court, Jones, 551 F.3d at 304, as that charge dealt with Constable, not Warren or Dougherty. Moreover, subsequent to the filing of the EEO Complaint regarding Case No. 4C-270-0097-04, Smith filed six other EEO charges in which he could have raised his claims against Dougherty. (See Docket Entry 17-1, ¶¶ 6-14; Docket Entries 17-8, 17-9, 17-10, 17-11, 17-12, 17-13, 17-14, 17-15, 17-16, 17-17.) Based on Smith's Complaint, it is not clear when Warren's unlawful acts occurred (see Docket Entry 1, ¶ 2), but there are at least four instances in which Smith filed EEO complaints after the period in which he alleged that Warren was supervising him (Docket Entry 17-1, ¶ 10, 12-15; Docket Entries 17-13, 17-15, 17-16, 17-17). Smith could have raised his claims against Warren in those complaints.[23] Therefore, Smith's claims related to Warren and Dougherty should be dismissed because Smith has failed to exhaust his administrative remedies with respect to

---

[23] Smith did file a complaint against Warren alleging retaliation claims after the time period in which Smith claimed Warren was his supervisor. (Docket Entry 17-1, ¶ 10; Docket Entries 17-13.) Smith has not asserted that said complaint in which the final action was taken on November 28, 2005, provides a suitable basis on which to bring his instant claims related to Warren's actions. (See Docket Entry 17-1, ¶ 10.c.; Docket Entries 17-13; Docket Entry 19.)

those claims.  <u>See, e.g.</u>, <u>Riley</u>, 872 F. Supp. at 1460 ("Here, each alleged act of retaliation occurred prior to the filing with EEOC, but the Plaintiffs still did not allege retaliation in their charges.  Therefore, the allegations of retaliation cannot withstand [the defendant's] motion for summary judgment.").

### 2.  Rehabilitation Act Claim(s)

Potter seeks summary judgment on Smith's failure-to-accommodate claim(s) because "Plaintiff fails to show he is disabled within the meaning of the Rehabilitation Act." (Docket Entry 17 at 17.)  Smith offered only the following response: "I had a CA-17 form stating my work restrictions and still received assignments that exceeded the six-hour restriction." (Docket Entry 19 at 2.)[24]

"Section 504 of the Rehabilitation Act provides that '[n]o otherwise qualified <u>individual with a disability</u> in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" <u>Constantine v. Rectors and Visitors of George Mason Univ.</u>, 411 F.3d 474, 491 (4th Cir. 2005) (quoting 29 U.S.C. § 794(a)) (brackets and ellipses in original, emphasis added).  Discrimination includes:

---

[24] Because Smith effectively failed to respond to this argument, the Court may grant summary judgment on the ground that he has abandoned his claim.  <u>See</u> M.D.N.C. R. 56.1; <u>Rogers</u>, 388 F. Supp. 2d at 641; <u>Wainright</u>, 2005 WL 1168463, at *13; <u>Brand</u>, 352 F. Supp. 2d at 618.

> not making <u>reasonable accommodations</u> to the known
> physical or mental limitations of an otherwise qualified
> individual with a disability who is an applicant or
> employee, unless such covered entity can demonstrate that
> the accommodation would impose an undue hardship on the
> operation of the business of such covered entity[.]

42 U.S.C. § 12112(b)(5)(A) (emphasis added). "In a failure to accommodate case, a plaintiff establishes a prima facie case by showing '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations.'" <u>Rhoads v. FDIC</u>, 257 F.3d 373, 387 n.11 (4th Cir. 2001).

Smith, therefore, must first prove that he falls within the Rehabilitation Act's protected class of individuals in that he is disabled as defined by the Act. Whether a plaintiff is disabled, pursuant to the Rehabilitation Act, "is a question of law for a court, not a question of fact for a jury." <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 268 (4th Cir. 2001). "The ADA[, Americans with Disabilities Act,] and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts[,]" <u>Baird ex rel. Baird v. Rose</u>, 192 F.3d 462, 468 (4th Cir. 1999), therefore, the Court also considers cases decided under the ADA in determining whether a plaintiff is disabled under the Rehabilitation Act, <u>Thomas v. Potter</u>, 325 F. Supp. 2d 596, 604 (M.D.N.C. 2004) (Beaty, J.).

A "disability" is a defined term in the Rehabilitation Act:

The term "disability" means, with respect to an individual—

> (A) a physical or mental impairment that substantially <u>limits one or more major life activities of such individual</u>;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1) (emphasis added); <u>see</u> 29 U.S.C. § 705(20)(B).

Smith appears to argue that he is disabled under the first prong in that he "was on limited restricted duties because of a job-related back injury" (Docket Entry 1, ¶ 1), and that his "CA-17 form stat[ed] [his] work restrictions . . . [,]" (Docket Entry 19 at 2).[25] "Major Life Activities means functions such as caring for

_____

[25] In <u>Adams v. Rice</u>, 531 F.3d 936, 945-46 (D.C. Cir. 2008), the United States Court of Appeals for the District of Columbia Circuit explained to whom the second prong applied: "The 'record of' definition was tailor-made for plaintiffs who, like Adams, claim they once suffered from a physical or mental impairment that substantially limited a major life activity, recovered from the impairment, but nonetheless faced employment discrimination because of it." Smith, however, does not assert that his disability is based on having suffered a physical impairment and making a subsequent recovery. (<u>See</u> Docket Entry 1, ¶ 1; Docket Entry 19.) In <u>Sutton v. United Air Lines</u>, the United States Supreme Court explained the "regarded as" prong of the definition:

> There are two apparent ways in which individuals may fall within [the "regarded as" category of the disability] definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual -- it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

(continued...)

oneself, performing manual tasks, <u>walking</u>, seeing, hearing, speaking, breathing, learning, and <u>working</u>." 29 C.F.R. § 1630.2(i) (emphasis added). The United States Supreme Court has explained the term "'[m]ajor life activities' . . . refers to those activities that are of central importance to daily life." <u>Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 197 (2002). In addition, the Supreme Court has held that:

> In order for performing manual tasks to fit into this category -- a category that includes such basic abilities as walking, seeing, and hearing -- the manual tasks in question must be central to daily life. If each of the tasks included in the major life activity of performing manual tasks does not independently qualify as a major life activity, then together they must do so.
>
> [T]hese terms need to be interpreted strictly to create a demanding standard for qualifying as disabled . . . .

<u>Id.</u> at 197.[26]

---

[25](...continued)
527 U.S. 471, 489 (1999). Smith does not argue that the USPS employees wrongly perceived him as disabled.

[26] On September 25, 2008, the ADA Amendments Act of 2008, was enacted. ADA Amendments Act of 2008, Pub. L. No. 110-325, 1222 Stat. 3553 (2008). The Act's effective date is January 1, 2009. ADA Amendments Act of 2008, Pub. L. No. 110-325, § 8, 1222 Stat. 3553, 3406-7 (2008). The Fourth Circuit has stated that "Congress did not express its intent for these changes to apply retroactively . . . ." <u>Shin v. Univ. of Md. Med. Sys. Corp.</u>, 369 Fed. Appx. 472, 478 n.14 (4th Cir. 2010) (unpublished). "[Other] circuits have found that the 2008 ADA amendments are not retroactive, and [the Fourth Circuit saw] no reason to disagree with their conclusion." <u>Id.</u> (citing <u>Thornton v. United Parcel Serv., Inc.</u>, 587 F.3d 27, 34 n.3 (1st Cir. 2009); <u>EEOC v. Agro Distrib., LLC</u>, 555 F.3d 462, 469-70 n.8 (5th Cir. 2009); <u>Milholland v. Sumner County Bd. of Educ.</u>, 569 F.3d 562, 565-67 (6th Cir. 2009); <u>Fredricksen v. United Parcel Serv., Co.</u>, 581 F.3d 516, 521 n.1 (7th Cir. 2009); <u>Becerril v. Pima County Assessor's Office</u>, 587 F.3d 1162, 1164 (9th Cir. 2009); <u>Lytes v. DC Water & Sewer Auth.</u>, 572 F.3d 936, 939-42 (D.C. Cir. 2009)). Because this claim relates to conduct from before January 1, 2009, the ADA Amendments Act of 2008 does not affect this case.

The Fourth Circuit has observed that "'Substantially limits' means, inter alia, 'significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" Rhoads, 257 F.3d at 387 (emphasis added) (quoting 29 C.F.R. § 1630.2(j)(1)(ii) (2000)). The federal regulations provide factors to consider "in determining whether an individual is substantially limited in a major life activity: (i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

A determination of whether a plaintiff's physical impairments render him "disabled" as defined by the Rehabilitation Act, requires that the Court conduct a "case-by-case" examination of whether his impairment "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Toyota Motor Mfg., Ky., Inc., 534 U.S. at 198. The Supreme Court has stated that "[i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." Id. Rather, a plaintiff must "offer[] evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." Id. (second bracket

in original) (quoting <u>Albertson's, Inc. v. Kirkingburg</u>, 527 U.S. 555, 567 (1999)).

The Complaint alleges that Constable failed to reasonably accommodate Smith's "work restrictions" related to "a job-related back injury." (Docket Entry 1, ¶ 1.) Smith stated that he had "weight lifting restrictions" and a limitation on "the maximum number of hours [he] was able to work." (<u>Id.</u>) Elsewhere in his Complaint, Smith referred to a walking restriction. (<u>Id.</u> ¶ 2.) Smith thus appears to contend that he is disabled based on substantial limitation in the major life activities of lifting, walking, and working.[27]

In support of this contention, Smith apparently relies on his submission of a medical diagnosis of his impairment, as stated in the CA-17 forms, the statements by two witnesses attached to his Response, and the comments made at his deposition. (<u>See</u> Docket Entry 19 at 2, 9-10.) These materials do not specifically describe (i) "The nature and severity of [Smith's] impairment" (<u>see</u> 29 C.F.R. § 1630.2(j)(2)); (ii) "The duration or expected duration of the impairment" (<u>see</u> <u>id.</u>); or (iii) "The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment" (<u>see</u> <u>id.</u>). Nevertheless, the

---

[27] In the January 7, 2004, Duty Status Report, Smith was prohibited from "Bending/Stooping." (Docket Entry 17-23 at 2.) Smith did not identify that limitation in his Complaint (<u>see</u> Docket Entry 1), or his Response (<u>see</u> Docket Entry 19). Moreover, the record contains no reference to that restriction subsequent to Constable's arrival at Gibsonville.

discussion that follows examines the major life activities based upon the information that has been provided.

### a.  Major Life Activity of Lifting

Smith's Complaint contends that he had a "weight lifting restriction" (Docket Entry 1, ¶ 1), but Potter argues that Smith "fails to show that he is substantially limited in the major life activity of lifting as compared to the average person in the general population" (Docket Entry 17 at 16).  This Court, per now-Chief Judge Beaty, previously observed in an analogous context that "the Fourth Circuit Court of Appeals' decision in *Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346 (4th Cir. 1996)* (per curiam), is controlling on the issue of whether Plaintiff is substantially limited in the major life activity of lifting." Thomas, 325 F. Supp. 2d at 605.  In Williams, the Fourth Circuit held "as a matter of law, that a twenty-five pound lifting limitation -- particularly when compared to an average person's abilities -- does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity." Williams, 101 F.3d at 349 (citing Aucutt v. Six Flags Over Mid-America, 85 F.3d 1311, 1319 (8th Cir. 1996)).  More recently, however, the Fourth Circuit stated that: "Our opinion in *Williams* should not be read to create a *per se* rule that a twenty-five pound lifting restriction can *never* constitute a disability." Taylor v. Fed. Express Corp., 429 F.3d 461, 463 n.2 (4th Cir. 2005) (emphasis in original).

In some of the Duty Status Reports, Smith's lifting restrictions were placed at fifteen pounds. (Docket Entry 17-22 at 2; Docket Entry 17-23 at 2.) Two other reports limited the weight he could lift to no greater than twenty-five pounds (Docket Entry 17-25 at 2; Docket Entry 17-26 at 2), and the amount he could lift was later reduced to fifteen pounds again (Docket Entry 17-28 at 2). His doctor then wrote, "I cannot find any medical basis for further restricting him at work <u>in any way and that he should return to all his regular duties at work</u>." (Docket Entry 17-29 at 2 (emphasis added).) Subsequently, Smith's doctor restricted the weight Smith could lift to a range of fifteen to twenty pounds. (Docket Entry 17-30 at 2.)

In his deposition, Smith admitted he could perform many activities without significant problems. He picks up his children from day care, watches them, and they do "fun things together." (Docket Entry 17-18:6-10.) Smith chaperones his children when they are outside, he and his wife take the children to the park, and they go on family outings. (<u>Id.</u> at 32:15-33:4.) Smith performs household activities such as washing dishes and taking out the trash. (<u>Id.</u> at 33:5-13.)

According to Smith, his back injury affects the manner in which he takes out his trash: "I take a little trash out because we have small bags, which is good for me and my back, and I just take it to the Dumpster. Sometimes I roll it down. Sometimes [my wife will] roll - roll it down the driveway." (<u>Id.</u> at 33:10-13.) In addition, Smith's family hires a service to do the yard work:

Q.  Is that because you don't have enough time to do it with the twins and everything?

A.  _Both_ that and also, I - I did the push mower, I think, about a year or so ago, <u>and it really affected my walking and my back the following day</u>.  So - so my wife, you know, she have a driving lawn mower, and, you know, she more capable of, you know, driving the lawn mower because it's hers, you know, because I'm not used to those types of chores, so - but, you know, lately we've been hiring people to do the yard work because I have to take those pain medications after - after cutting the grass and stuff.  So I try to avoid taking too many pain medications.

(Docket Entry 17-18 at 33:14-34:6 (emphasis added).)  Smith belongs to a gym where he works out at least twice a week engaging in cardiovascular activities and stretching so that his "back and everything won't get too tight."  (_Id._ at 30:21-31:20.)

Although, according to Smith, his injury was identified as "permanent," Smith's physical impairments and restrictions do not appear permanent, as the evidence demonstrates that his condition improved to where his doctor considered the severity to be so minimal that no restriction was required.  <u>See, e.g.</u>, <u>Pollard v. High's of Balt., Inc.</u>, 281 F.3d 462, 467-68 (4th Cir. 2002) ("[A] temporary impairment, such as recuperation from surgery, will generally not qualify as a disability under the ADA.  An impairment simply cannot be a substantial limitation on a major life activity if it is expected to improve in a relatively short period of time." (citations omitted)).  Moreover, Smith failed to show that the lifting limitation affected the performance of activities other than yard work.

Under these circumstances, Smith has not demonstrated that he suffers from a substantial limitation in the major life activity of lifting as compared to an average person in the general population.

### b.  Major Life Activity of Walking

Smith appears to contend that he has a physical impairment that substantially limits him in the major life activity of walking.  (Docket Entry 1, ¶ 2.)  Potter, however, argues that Smith "fails to show that his walking restriction severely restricts his ability to walk as compared to an average person in the general population."  (Docket Entry 17 at 16.)

The Duty Status Reports show that, between December 3, 2003, and January 27, 2004, Smith was restricted to walking an hour per day.  (Docket Entry 17-22 at 2; Docket Entry 17-23 at 2; Docket Entry 17-25 at 2.)  On February 4, 2004, the walking restriction was revised to walking an hour per day in fifteen-minute increments.  (Docket Entry 17-26 at 2.)  On February 16, 2004, the fifteen-minute-increment restriction was removed, but Smith continued to be limited to only walking an hour per day.  (Docket Entry 17-28 at 2.)  On March 10, 2004, his doctor wrote that, "I cannot find any medical basis for further restricting him at work in any way and that he should return to all his regular duties at work."  (Docket Entry 17-29 at 2 (emphasis added).)  On March 31, 2004, a Smith was again restricted to walking only an hour per day. (Docket Entry 17-30 at 2.)  These Duty Status Reports show that Smith suffered from a temporary impairment that improved in March

of 2004, to the point where Smith's doctor removed all work restrictions, but subsequently reinstated duty limitations.

Smith provides statements from two witnesses regarding their observations of him (see Docket Entry 19 at 9-10), those statements do not alter the conclusions reached based on the foregoing Duty Status Reports. Donahue Troyer wrote that: "Beginning at approximately August 2003, I noticed Mr. Gary Smith limping while carrying mail on his route. I inquired of his limping and he stated that he had injured himself while playing basketball a few nights ago. As days and weeks went by, I saw that his limp was getting progressively worse as he continued walking his route." (Id. at 9 (emphasis added).) Peggy Martin wrote that she "witnessed Mr. Smith carrying mail downtown during the month of August 2003[,]" and that "[o]n September 2003, Mr. Smith . . . was carrying a package to my home as he could barely walk. He told me that something had snapped while delivering a package to Aero business." (Id. at 10.) These statements demonstrate that Smith had walking problems in August and September of 2003, which included a "limp" and that Smith "could barely walk." Neither witness' statement can be interpreted as describing Smith's condition beyond September of 2003.

As discussed above, Smith explained in his deposition that he engages in different activities and identified some acts that he cannot perform due to his back. Smith also stated that some actions had been limited due to his foot injury, such as mowing the lawn. He noted that his foot injury limited his ability to play

basketball. (Docket Entry 17-18 at 14:9-10 ("I really was into basketball, but right now because of my ankle, I don't play as much."), 15:19-21 ("Q. . . . You mentioned basketball? A. No, I don't play no more.").) He, however, explained that, on normal days, walking is not a problem for him:

> Q. Okay. Now is walking normally a problem for you, or is it just when you do something like that where it gets aggravated?
>
> A. Well, if I - you know, when I aggravate it, you know, because when you walk doing the lawn, you hit, you know, humps and this, that, and the other, and it does play a factor in my - in my walking.
>
> Q. Okay. But on normal days ---
>
> A. No. No.
>
> Q. --- like walking over here, you probably had to park pretty far away and walk over here.
>
> A. Yes, ma'am.
>
> Q. Was that a problem for you?
>
> A. It won't [sic] too much of a problem.
>
> Q. Normally it's not or---? I'm sorry. What did you say?
>
> A. It - it wasn't too much of a problem.

(Docket Entry 17-19 at 34:7-23.) Therefore, beyond the restrictions identified in the Duty Status Reports, Smith's only limitations with his walking occurred when mowing the lawn and playing basketball.

Smith's walking limitations are distinguishable from more severe problems which courts have found insufficient to constitute a substantial impairment of a major life activity. For example,

the United States Court of Appeals for the Eighth Circuit held that the evidence did not show that the plaintiff's ability to walk was substantially limited where: "[a]ccording to [the plaintiff], he can only walk approximately one-quarter of one mile before he must stop and take a rest. [The plaintiff] is numb in parts of the toes on his left foot and his left leg, and his left knee collapses. He also stated that he walks 'with a cane on occasion.' [The plaintiff] can walk well enough, however, that he has not obtained a handicapped parking pass." <u>Wood v. Crown Redi-Mix, Inc.</u>, 339 F.3d 682, 686 (8th Cir. 2003) (internal citations omitted). <u>See also</u> <u>Gallimore v. Newman Mach. Co., Inc.</u>, 301 F. Supp. 2d 431, 449 (M.D.N.C. 2004) (Beaty, J.) (finding that plaintiff's limitations on his ability to walk do not constitute disabilities where plaintiff could walk half a mile without pain, walks for recreation, has no medical limitations on the distance he may walk, and is able to climb some stairs without pain).

Accordingly, Smith has failed to demonstrate a substantial limitation in the major life activity of walking as compared to an average person in the general population.

### c. Major Life Activity of Working

Smith also appears to assert that his physical impairments substantially limit him in the major life activity of working. (Docket Entry 1, ¶ 1.) Potter, however, argues that Smith "cannot show that he was substantially limited in the major life activity of working." (Docket Entry 17 at 16.)

The Supreme Court and the Fourth Circuit have not decided whether working constitutes a major life activity. See Taylor v. Fed. Express Corp., 429 F.3d 461, 463 (4th Cir. 2005) (assuming without deciding that working is a major life activity) (citing Sutton v. United Air Lines, 527 U.S. 471, 492 (1999)). Nevertheless, other courts within the Fourth Circuit have evaluated working as a major life activity, acknowledging Taylor. See, e.g., Rahmaan v. Walmart, No. 2:08-cv-2909-DCN, 2010 U.S. Dist. LEXIS 21020, at *7 (D.S.C. Mar. 8, 2010) (unpublished).

The Supreme Court has explained when a plaintiff's major life activity of working would be substantially limited:

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

Sutton, 527 U.S. at 492. Similarly, the Fourth Circuit has held that "a plaintiff seeking to demonstrate a limitation in her ability to work must demonstrate that she is foreclosed generally from the opportunity to obtain the type of employment involved, not merely that she is 'incapable of satisfying the singular demands of a particular job.'" Hooven-Lewis, 249 F.3d at 269 (quoting Forrisi v. Bowen, 794 F.2d 931, 934-35 (4th Cir. 1986)).

Potter argues that Smith accepted a limited duty job offer with Constable and continues to work at the USPS (Docket Entry 17

at 17 (citing Docket Entry 17-21, ¶ 10).)  Smith's response focuses

on Constable's failure to comply with the Duty Status Reports:

> [Constable's] failure to look at the [CA-17 ]form shows
> negligence and a disregard for my well-being.  Mr.
> Constable's "oversight" does not negate the fact that I
> had a CA-17 form stating my work restrictions and still
> received assignments that exceeded the six-hour
> restriction. . . . Even after reading the CA-17 on May 4,
> 2004, Mr. Constable still scheduled me to work more than
> six hours.  Although he claims he received an email from
> his manager on May 6, 2004 to begin working me for six
> hours, he did not go out on the route and find me to make
> sure that I did not work more than six hours on that day.
> Mr. Constable was not diligent in trying to make sure he
> was not violating my restrictions.  I was carrying more
> than the weight restrictions and working over the six
> hour restrictions. . . .
>
> The facts are that I had medical restrictions, gave
> Mr. Constable the documentation showing the restrictions,
> and they were not followed by Mr. Constable.

(Docket Entry 19 at 2-3.)  Smith does not address whether he was

incapable of satisfying the demands of his job, or the duties

described in the Offer of Modified Assignment (Limited Duty) that

he signed with Constable (Docket Entries 17-27).  (See Docket Entry

19.)  Moreover, he fails to show that he is "foreclosed generally

from the opportunity to obtain the type of employment involved[,]"

Hooven-Lewis, 249 F.3d at 269.

To the contrary, as Potter noted in his brief, Smith is

employed full time with the USPS.  (Docket Entry 17 at 17; Docket

Entry 17-18 at 17:20-24, 18:6-8.)  Smith does not show that his

lifting, walking, and time restrictions were substantially limiting

his major life activity of working in that they disqualified him

from a broad range of jobs.  See Wood, 339 F.3d at 686 ("An

impairment that disqualifies a person from only a narrow range of

jobs is not considered a substantially limiting one." (internal citations omitted)). Rather, the Offer of Modified Assignment (Limited Duty) (Docket Entry 17-27), and his current full-time employment demonstrate that his impairments did not substantially limit his major life activity of working.

Therefore, Smith has failed to show that his back or foot injuries constitute impairments that substantially limit him in the major life activity of working as compared to an average person in the general population.

### III. CONCLUSION

Smith has not exhausted his administrative remedies with respect to his claims related to Warren and Dougherty's conduct, and his Rehabilitation Act claims fail because he has not shown that he "'had a disability within the meaning of the statute[,]'" Rhoads, 257 F.3d at 387 n.11.

**IT IS THEREFORE RECOMMENDED** that Potter's Motion for Summary Judgment (Docket Entry 16) be **GRANTED**.

                              /s/ L. Patrick Auld
                              **L. Patrick Auld**
                    **United States Magistrate Judge**
December 17, 2010